# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 5567 | DATE | 10/28/2004 |
| CASE TITLE | Household Finance Services, Inc. vs. The Mortgage Group, et al. | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment is denied in part and granted in part. Defendants' motion for summary judgment is denied.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | OCT 29 2004 | |
| | Notified counsel by telephone. | | date docketed 04 | 87 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 10/28/2004 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | hmb | courtroom deputy's initials | hmb | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DOCKETED

OCT 2 9 2004

|  |  |  |
|---|---|---|
| HOUSEHOLD FINANCIAL SERVICES, INC. A Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 01 C 5567 Nan R. Nolan, Magistrate Judge |
| THE MORTGAGE GROUP, a South Carolina corporation, JACK M. THOMPSON II, MARK E. SMITH, and BRIAN SCHUMACHER, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Household Financial Services, Inc. ("HFS") and defendant The Mortgage

Group ("TMG") entered into an agreement whereby TMG sold a collection of loans to

HFS. As it turned out, some of these loans were bad. According to HFS, TMG breached

its representations and warranties as to the bad loans – four of which are issue here – and

breached its obligation to repurchase those loans and indemnify HFS for damages resulting

from that breach. HFS also contends that the individual defendants, Jack Thompson, Mark

Smith, and Brian Schumacher, are liable to it under the terms of a guaranty agreement they

executed in connection with the sale. According to the defendants, HFS's failure to discover

potential problems with the loans when it reviewed them prior to purchase relieves the

defendants of liability. In addition, the individual defendants argue that their guaranties

did not apply to the loans at issue. This matter is before the court on the parties' renewed

87

cross-motions for summary judgment; their previous efforts, for the most part, were unsuccessful.[1] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, HFS's motion is denied in part, and granted in part, while the defendants' motion is denied.

## I. BACKGROUND

For a second time, the parties have filed cross-motions for summary judgment in this case, and have jointly filed a *Joint Local Rule 56(a)(3) Statement of Undisputed Facts* ("*Joint St.*"), which sets out the facts the parties agree upon. Both parties have also filed "supplemental" statements of facts under Local Rule 56.1, and respective responses to those supplemental statements. As such, the court draws the facts of this case from those submissions, noting disagreements between the parties where they arise.

Among other things, HFS is in the business of acquiring and servicing mortgage loans from other lenders or brokers, such as TMG. During the relevant time, TMG was originating sub-prime residential mortgage loans, then selling them off to secondary purchasers like HFS. The individual defendants had the following roles with TMG at that

---

[1] In a Memorandum Order dated February 6, 2004, Magistrate Judge Edward A. Bobrick granted HFS's motion as to two loans, but denied it as to the loans at issue here. He also denied the defendants' motion for partial summary judgment. Because Magistrate Judge Bobrick's ruling was, for the most part, precipitated by the parties' failure to follow Local Rule 56.1, the parties jointly moved the court to "withdraw" that order, contending it was the product of a "misunderstanding." The court denied the motion, but later granted the parties leave to again file motions for summary judgment. On June 15, 2004, this case was transferred to Magistrate Judge Nan R. Nolan, pursuant to local Rule 40.1(f), upon Magistrate Judge Bobrick's retirement from the bench.

time: Thompson was chief executive officer, and Smith and Schumacher were vice presidents.

On May 2, 2000, HFS and TMG entered into a "Flow Loan Purchase Agreement." (*Joint St.*, ¶ 9; Ex. A). From all appearances, the Flow Loan Purchase Agreement covered the conditions under which HFS would purchase loans from TMG, including a formula for purchase prices, a list of representations and warranties on TMG's part, and repurchase and indemnification provisions. It did not, however, refer to any particular loans, and no loans changed hands for quite some time after the agreement was executed. This might have been because, as the parties agree, despite execution of the Flow Loan Purchase Agreement, "TMG had still not been approved by [HFS] to sell loans to it." (*Joint St.*, ¶ 9). HFS required not only additional documentation from TMG, but personal guaranties from the individual defendants. To that end, Thompson, Smith, and Schumacher each executed guaranty agreements almost four months later, on August 28, 2000. (*Joint St.*, ¶ 9). In pertinent part, the guaranties provided:

> As an inducement to [] . . . to enter into a Bulk Continuing Loan Purchase Agreement and/or a Flow Loan Purchase Agreement ("Agreements") with [TMG] . . . [Guarantor] hereby unconditionally and absolutely guaranties to [plaintiff] 1) the prompt and complete payment of all sums due or to become due from [TMG] whether by acceleration or otherwise, pursuant to the provisions of the Agreements including, without limitation, the repurchase and indemnification provisions thereof, and 2) the punctual and complete performance and observance by [TMG] of all the terms, conditions, representations, warranties, obligations, liabilities and covenants contained in the Agreements, whether according to the present terms thereof, or pursuant to any changes made thereto now or at any time in the future.

3

(*Defendants' Supplemental Rule 56.1(a)(3) Statement of Undisputed Facts* ("*Def.Supp.St.*"); Ex M). Two months after that, on October 26, 2000, HFS "approved" TMG as a loan seller.

A few days later, on November 1, 2000, TMG offered HFS sixty-three loans for purchase. Among these loans were four that are the subject matter of the parties' summary judgment motions. The parties refer to these as the two "Afford loans" and the two "Jack loans." After TMG provided HFS with the files covering the sixty-three loans, HFS performed a "due diligence review," and found thirty-six of the loans acceptable for purchase. Part of HFS's review involved checking the files against its "ineligible list," a catalog of those entities with whom HFS would not do business. (*Joint St.*, ¶¶ 11-14). HFS informed TMG that one of the loans was rejected for purchase based on this list. (*Joint St.*, ¶ 15). Of the thirty-six loans HFS found acceptable for purchase, however, it would later become apparent that four – the Afford and Jack loans – involved entities from HFS's ineligible list. (*Joint St.*, ¶¶ 16-19, 23). HFS indicated to TMG that it would pay a higher price for the thirty-six loans if the purchase were made under a "Bulk Loan Agreement," and TMG agreed to such an arrangement on November 6, 2000. (*Joint St.*, ¶¶ 20-21). The parties closed their deal on the thirty-six loans on November 16, 2000.

In three letters dated February 1, 2001, HFS requested that TMG repurchase the "Afford" and "Jack" loans pursuant to certain provisions of the Bulk Loan Agreement.

HFS demanded that TMG repurchase the loans under Section 4.2(b) of the Bulk Loan

Agreement:

> <u>Origination; No Misstatement or Fraud</u>.. . . The documents, instruments and
> agreements submitted for loan underwriting were not falsified and contain no
> untrue statement of material fact and do not omit to state a material fact
> required to be stated therein or necessary to make the information and the
> statements therein not misleading. No fraud was committed in connection
> with the origination of the Loan. Seller has not made any representations to
> the Obligor that are inconsistent with the mortgage instruments used.

(*Def.Supp.St.*; Ex. J, at 12). Household claimed the loan files associated with these two

loans contained false statements. (*Joint St.*, ¶¶ 31, 35). TMG has not repurchased any of

the four loans at issue.

HFS maintains that TMG is required to repurchase the "Afford" and "Jack" loans

under Section 9.1 of the Bulk Loan Agreement, which provides in pertinent part:

> In the event that . . . there has been a breach of any of Seller's warranties,
> representations, covenants or agreements contained in this Agreement . . .
> [HFS] shall give notice of such . . . breach. If Seller fails to cure such . . .
> breach . . . within 30 days of Seller's receipt of such notice, Seller shall
> immediately repurchase such Loan at the repurchase price set forth . . .
> <u>provided</u>; <u>however</u>, that with respect to a breach of the representation
> contained in Section 4.3(c), Seller's repurchase obligation will be immediate
> upon receipt of notice of breach.

(*Def.Supp.St.*; Ex. J, at 29). HFS also maintains that, under the terms of their guaranties,

the individual defendants are liable for TMG's failure to repurchase the loans.

TMG contends that HFS is equitably estopped from enforcing the repurchase

provision in the Bulk Loan Agreement because, by offering to purchase thirty-six loans

following its review, it was representing that none of the participants in those loans was on

5

the "ineligible list." (*Defendants' Memorandum in Support of Their Renewed Motion for Partial Summary Judgment*, at 9-14). In addition, TMG argues that HFS's failure to discover that the loans in question ran afoul of its internal guidelines constituted misconduct on HFS's part and also relieves TMG of liability for repurchase. (*Id.*, at 14-15). In support of this position, TMG relies on Section 10.1(c) of the Bulk Loan Agreement, which states that the "Seller shall not have any liability in respect of the representations or warranties on the part of Seller herein contained to the extent such liability would not have arisen but for [HFS's] own willful misconduct or negligence." (*Def.Supp.St.*, Ex. J, at 31). Finally, the individual defendants argue that the guaranties they executed do not apply to transactions undertaken pursuant to the Bulk Loan Agreement.

## II. ANALYSIS

### A. Summary Judgment

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and ... demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party successfully carries this burden, the non-moving party must "go beyond the pleadings" and present specific facts which show that a genuine issue of material fact exists. *Id.* at 324, 106 S.Ct. at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986). When, as here, the parties file

6

cross-motions for summary judgment, the court must look to the burden of proof that each party would bear on an issue of trial, and then require that party to go beyond the pleadings and to affirmatively establish a genuine issue of material fact. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997), *citing Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## B. HFS's Motion

HFS's case against the TMG is based on TMG's alleged breach of a warranty regarding false statements in connection with the origination of the Afford and Jack loans. As already noted, under Section 4.2(b) of the Bulk Loan Agreement, TMG warranted that the loans did not contain any untrue statements or omissions of material fact, and that no fraud was committed in connection with the making of the loans. HFS contends that the Afford and Jack loans did, in fact, contain untrue statements, meaning that TMG had breached the warranty. According to HFS, this triggered the repurchase provision of the Bulk Loan Agreement at Section 9.1. Thus, HFS argues, it is entitled to summary judgment on its complaint as to the Afford and Jack loans.

The manner in which HFS has presented its motion for summary judgment leaves this case in a strange posture. Clearly, HFS has the burden of proving that a breach of warranty occurred; that there *were* false statements in the loans at issue. *Bysom Enterprises, Ltd. v. Peter Carlton Enterprises, Ltd.*, 267 Ill.App.3d 1, 7, 641 N.E.2d 838, 842-43 (1st Dist. 1994). As the party moving for summary judgment, it is incumbent upon HFS to

demonstrate the absence of any issue of material fact as to this question. As already noted, however, the parties' stipulated facts demonstrate that HFS "*claimed* that the loan files submitted with the . . . Loans contained false statements." (*Joint St.*, ¶¶ 31; 35). Obviously, HFS cannot rest upon a mere claim in a summary judgment motion. Yet, according to HFS, "[i]t is undisputed that the loan files for the four loans that remain at issue contained false statements." (*HFS's Memorandum in Support of its Renewed Motion for Summary Judgment*, at 2). One might expect to find such an assertion in HFS's Local Rule 56.1 submissions, thereby rendering this the "simple case" HFS claims it to be. Unfortunately, no such fact is to be found in HFS's submissions.

Rather than assert that the loans contained false statements, HFS offers these two paragraphs in its Supplemental Rule 56.1(a)(3) Statement of Uncontested Facts:

> In early 2001, [HFS] became aware that certain of the loans it had purchased from TMG, including the Afford and Jack Loans, were fraudulent and contained many false statements. Thus, on February 1, 2001, [HFS] sent letters to TMG demanding the repurchase of the Afford and Jack loans.
>
> \* \* \*
>
> After discussions with [HFS], and in order to satisfy itself that the loans were fraudulent, TMG also talked to [HFS] and an FBI agent about the Afford and Jack Loans and received information that supported [HFS's] contentions. Following these discussions, TMG never communicated any dispute about the existence of fraud.

(*HFS's Supplemental Rule 56.1(a)(3) Statement of Uncontested Facts* ("*HFS.Supp.St.*"), ¶¶ 7-8). While it is true that defendants have failed to respond to either of these paragraphs

thereby admitting them under Local Rule 56.1(b)(3), *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003), it is unclear that these "facts" entitle HFS to summary judgment.

This would indeed be a simple case if somewhere in its statement of facts HFS asserted that the loans contained false statements. If such a statement were deemed admitted, the court could find that TMG had breached the warranty at issue. Neither of the paragraphs, however, affirmatively state that the loans contained false statements. Instead, they seem to circumvent the issue, casting doubt on whether there were false statements in the loans at issue rather than demonstrating there were. The paragraphs indicate that HFS "became aware" that the loans contained false statements, that TMG received information to support HFS's contentions regarding the loans, and that TMG did not communicate a dispute to HFS. In ruling on HFS's previous motion for summary judgment, the court indicated that HFS had to show that there was no material issue of fact as to whether the Afford and Jack loans contained false statements. (*Memorandum Order of February 6, 2004*, at 9-10). Nevertheless, in its renewed motion, HFS continues to skirt the issue of whether the loans at issue *actually did contain false statements*. Without demonstrating that there is no material issue of fact regarding this question, HFS cannot show the warranty was breached and cannot establish it is entitled to summary judgment.

HFS's instant motion for summary judgment does improve upon its original motion in one respect: HFS supports its factual assertions with references to the record. Review of those references, however, tends to undermine, rather than bolster, those factual

assertions. HFS cites long portions of the testimony of TMG's chief executive officer, Jack Thompson, in the hope of demonstrating that TMG was satisfied that the loans contained false statements. (*HFS.Supp.St.*, ¶ 8; Ex. A, Dep. of Thompson, at 75-90, 108-118). Some of this testimony regards a loan no longer at issue in this case, the "Hawkins" loan. (*Id.*, Ex. A, Dep. of Thompson, at 78-84, 90). As for the Afford and Jack loans, Thompson's testimony cannot be characterized as a concession that they contained false statements by any means. He indicated that he felt TMG had "the right to investigate that on [its] own." . ." (*Id.*, Ex. A, Dep. of Thompson, at 109). He specifically questioned whether HFS's information regarding the loans was true. (*Id.*, Ex. A, Dep. of Thompson, at 110). He said he never formed an opinion as to whether HFS's allegations were true. (*Id.*, Ex. A, Dep. of Thompson, at 112, 115). The FBI informed him that one of the individuals involved with the loans was under investigation (*Id.*, Ex. A, Dep. of Thompson, at 114), the results of which, if any, HFS does not discuss in its submissions. Thus, the loans might have been suspect, TMG might admit that they were suspect, and they might have been the subject of an investigation. All this means is that they *might* have contained false statements. That does not entitle HFS to summary judgment on this issue.

The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material

10

fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. "Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1609-10 (1970) (quoting the Advisory Committee Note on the 1963 Amendment to subdivision (e) of Rule 56 of the Federal Rules of Civil Procedure). "Even if the opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only 'if appropriate – that is, if the motion demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.'" *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (citation omitted). Here, HFS has the burden of proof on the issue of whether the loans in question contained false statements. It has simply not demonstrated the absence of a material issue of fact as to that question. Accordingly, the court cannot conclude that HFS is entitled to summary judgment as a matter of law.

## C. Defendants' Motion

Defendants raise three issues in their motion for summary judgment: that HFS is equitably estopped from enforcing the repurchase provisions in the Bulk Loan Agreement; that HFS engaged in misconduct in its due diligence review of the loans TMG submitted for sale; and that the personal guaranties the individual defendants executed are not applicable to the loans at issue here. The court will address each of these issues in turn.

### 1. Equitable Estoppel

Defendants' equitable estoppel argument comes as something of a surprise, as they did not mention it in their previous motion for summary judgment and, indeed, did not plead it in their answer. Under Fed.R.Civ.P. 8(c), estoppel is an affirmative defense that a party must "set forth affirmatively"in its answer. As a general matter, an affirmative defense that is not timely pled is waived. *Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998); *see also Hubble v. O'Connor*, 291 Ill.App.3d 974, 984, 684 N.E.2d 816, 823 (1st Dist. 1997) (under Illinois law, estoppel must be affirmatively pled, or it is waived). Here, after they were granted leave to amend their original affirmative defenses, defendants pled only that HFS failed to comply with the terms of the Loan Purchase Agreement, that HFS failed to mitigate damages, that HFS engaged in misconduct or was negligent in its review of the loans, and that any damages must be offset by sums recouped via foreclosure. (*Amended Affirmative Defenses*, ¶¶ 1-4). Clearly, defendants' estoppel defense, raised for the first time in a renewed motion for summary judgment, has been waived.

Even assuming the defendants had not waived their equitable estoppel defense, were the court to consider defendants' arguments, those arguments would fail. Defendants bear the burden of proof on this issue and, not only that, they must prove it by clear and unequivocal evidence. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill.2d 302, 314, 751 N.E.2d 1150, 1158 (2001). The party claiming equitable estoppel must prove each of the following elements: (1) the other person misrepresented or concealed material facts; (2)

the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof. *Geddes,* 196 Ill.2d at 313-14, 751 N.E.2d at 1157. Here, the defendants argue that once HFS performed its due diligence review of the loans defendants offered for sale, HFS's selection of certain loans to purchase constituted a representation that those loans did not involve entities on HFS's ineligible list. Defendants contend that they then relied upon this representation in deciding to sell the loans under the Bulk Loan Agreement instead of the Flow Loan Agreement. When it turned out to be inaccurate, according to the defendants, they were prejudiced insofar as they had not warranted the information in the loans under the Flow Loan Agreement, and would not have been liable for the repurchase of the loans at issue. Review of defendants' submissions in this matter reveals that their equitable estoppel argument is just that: an argument. They have failed to establish each of the elements of equitable estoppel by clear and unequivocal evidence. In addition, the defendants have also failed to establish that a genuine issue of material fact exists as to each of these elements that would preclude the entry of summary judgment for HFS.

In order to establish the first two elements of equitable estoppel, defendants must demonstrate that HFS misrepresented or concealed material facts and that it knew at the time it made the representations that they were untrue. *Geddes*, 196 Ill.2d at 313, 751 N.E.2d at 1157. Here, the defendants admit that they cannot assert that HFS intentionally misrepresented or concealed any material facts. (*Defendant's Memorandum in Support of Their Renewed Motion for Summary Judgment ("Def.Mem.")*, at 11-12). Instead, they contend that HFS's failure to advise them that the participants in the Afford and Jack loans were on HFS's ineligible list amounted to a concealment of material facts. As defendants would have it, when HFS offered to purchase the loans in question, it constituted a representation that none of the participants in those loans were on HFS's ineligible list. (*Def. Mem.,* at 10-12). In order to establish equitable estoppel, however, "[s]ome definite, unequivocal behavior must be shown – conduct fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security." *Clauson v. Smith*, 823 F.2d 660, 663 (7th Cir. 1987). Defendants describe no such behavior here, let alone prove that any occurred.

While there is no dispute that HFS undertook a due diligence review of the loans defendants offered for sale, there is nothing to suggest that defendants had any idea what that entailed. HFS made no representation to defendants that it would be checking the loans against its ineligible list or that it would be conducting any type of review at all in order to protect itself against fraud, let alone defendants. (*HFS's Supplemental Local Rule 56.1(a)(3)*

*Statement of Uncontested Facts ("HFS.Supp.St."),* ¶ 5).[2] According to HFS, its due diligence review was an internal procedure it followed strictly for its own benefit, and was not undertaken as part of any agreement with any loan sellers. (*HFS.Supp.St.,* ¶ 6). Defendants are unable to dispute this, but complain that had the review been accurate, HFS would not have purchased the Afford and Jack loans. *(Defendants' Rule 56.1(b)(3) Response ("Def.Resp."),* ¶ 6). While this might have been the case, it is not the same as proving that HFS concealed or misrepresented any material facts to defendants. Beyond defendants' bald contentions, there is nothing in the record that would suggest that HFS's selection of loans to purchase amounted to a misrepresentation of any material fact. For this reason alone, defendants' equitable estoppel theory fails.

Defendants must also prove, by clear and unequivocal evidence, that HFS had actual or implied knowledge that the loans at issue involved entities on its ineligible list. Obviously, when HFS's underwriters perform a due diligence review, there is the chance that errors will be committed. In this instance, the task involved checking sixty-three loan files against approximately one thousand names in a sixteen-page list. (*Def.Supp.St.;* Ex. C). While it is undisputed that four errors were made during the review, defendants fail to

---

[2]  Defendants deny this, but offer no evidentiary support for their denial. Instead, they merely contend that, "[b]y undertaking such a review, [HFS] represented to Defendants it was utilizing its vast resources to confirm the proper nature of the loans." (*Defendants' Rule 56.1(b)(3) Response,* at ¶ 5). Defendants had no knowledge of the parameters of HFS's review and, in fact, did not see an "ineligible list" until after the Bulk Loan Agreement purchase was completed. (*Def.Supp.St.,* ¶ 15; Ex. E, Dep. of Thompson, at 47-48).

explain how this invested HFS with knowledge that the loans it chose for purchase involved entities on its ineligible list. This is yet another flaw that dooms defendants' equitable estoppel theory.

The next problem in defendants' equitable estoppel theory is that they are unable to establish that HFS intended that defendants rely on its internal review of the loans for sale. Defendants merely assert as much in their memorandum in support of their summary judgment motion, and leave it at that. (*Def.Mem.*, at 13). There is no evidence, let alone clear and unequivocal evidence, that such was the case. Indeed, a review of defendants' factual submissions in this matter reveals that defendants do not even assert this as a fact in support of their motion. On the other hand, defendants cannot dispute – at least not with any evidence – that HFS conducted its in-house review for its own protection, and that it did so without any agreement with a potential seller. (*HFS.Supp.St.*, ¶¶ 5-6; *Def.Resp.*, ¶¶ 5-6). The mere fact that HFS reviewed the loans before deciding to purchase them is no indication that they intended – or, indeed, could have guessed – that the defendants would rely on their review and selection process. Again, this deficiency alone is enough to scuttle defendant's equitable estoppel theory.

Perhaps the most significant flaw in defendants' equitable estoppel theory, however, involves defendants' contention that they reasonably relied on the HFS review in deciding to sell loans under the Bulk Loan Agreement. Again, defendants point to no evidence to support this claim, and do not assert it as a fact in support of their motion for summary

judgment in any of their Local Rule 56.1 submissions. Also, the foregoing discussion demonstrates that if defendants did indeed rely on the HFS review, such reliance was certainly not *reasonable*. More troubling, however, is that the evidence of record demonstrates that defendants did not, in fact, rely on HFS's review in deciding to sell loans under the Bulk Loan Agreement. On the contrary, their chief executive officer testified as follows at his deposition:

> Q: And what types of issues did you all talk about before making the decision to enter into an agreement?

> A: We didn't really talk about any issues other than Mr. Ormond advised me that on this particular pool of loans we would be paid more if we signed the Bulk Agreement.

(*Def.Supp.St.*; Ex. E, Dep. of Thompson, at 42). Curiously, defendants point to no testimony in the record to the effect that it was HFS's review that prompted their entry into the Bulk Loan Agreement. Thus, it is disingenuous, at the very least, for defendants to now suggest that they relied upon anything other than their pecuniary interests in deciding to sell loans under the Bulk Loan Agreement. And their disingenuous suggestion neither supports their motion for summary judgment nor would preclude the entry of summary judgment in favor of HFS.

Even if defendants could show that they relied upon HFS's in-house review in deciding to sell loans under the Bulk Loan Agreement, they would still have to establish that they relied upon the representations to their detriment, and that they would be prejudiced by HFS's enforcement of the Bulk Loan Agreement's repurchase provision.

17

The defendants' argument as to these elements is based upon their assertion that, in the absence if HFS's review of the loans, defendants would have sold those loans under the Flow Loan Agreement and they "would not have warranted the information in the loans." (*Def.Mem.*, at 13). According to the defendants, they originally offered the sixty-three loans for sale under the Flow Loan Agreement, which did not contain the warranty provisions of the Bulk Loan Agreement. (*Def. Mem.*, at 9-10). Although defendants call this an "important distinction," it does not appear in either the Joint Statement of Facts, or any of defendants' Local Rule 56.1.[3] By way of the court's own comparison, however, the Flow Loan Agreement includes thirty-one seller's warranties while the Bulk Loan Agreement includes fifty-nine. (*Joint St.*, Ex. A, at 3-9; *Def.Supp.St.*, Ex. J, at 9-21). Both agreements require the seller to repurchase loans should any of these warranties be breached. (*Joint St.*, Ex. A, at 12-13; *Def.Supp.St.*, Ex. J, at 29-30). Based on this comparison, it might be supposed that the Bulk Loan Agreement was bit more harsh from a seller's perspective than the Flow Loan Agreement. In addition, the Flow Loan Agreement does not appear to have

---

[3]     Defendants cite paragraphs eight and twenty-one of the Joint Statement of Facts in support of this contention (*Def.Mem.*, at 10). Neither of those paragraphs, however, mention any differences in the two documents' warranty provisions. It may well be that defendants are merely tasking the court with comparing the eighteen-page Flow Loan Agreement with the thirty-eight page Bulk Loan Agreement in order to discover the differences in warranties, but this is inappropriate in a summary judgment proceeding. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004) (court need not review a lengthy record for facts that a party could have easily identified with greater particularity). Defendants have already been cautioned on two occasions regarding their compliance, or lack thereof, with summary judgment procedures. (*See Memorandum Order of February 6, 2004*, at 3-4, 10; *Minute Order of June 14, 2004*). Surely, they could not have expected their renewed motion to succeed despite their continued neglect of these procedures.

the exact "no false statements" warranty at issue here. But, the fact that there are differences in the warranty provisions between the two agreements does not necessarily mean that defendants changed their position to their detriment, and certainly does not constitute clear and unequivocal evidence that they did. Some Flow Loan Agreement warranties might have been harsher than those in the Bulk Loan Agreement. At the time defendants decided to enter the Bulk Loan Agreement, there was nothing to suggest that they knew that this one warranty not found in the Flow loan Agreement would later come into play would later come into play. As defendants have presented it, this element of equitable estoppel is, once again, simply a matter for speculation.

Beyond that, the record actually calls into question whether defendants actually did decide to change their position to their detriment based on HFS's review of the loans. According to his deposition testimony, Thompson – TMG's chief executive officer – did not read the Bulk Loan Agreement, determine how it differed from the Flow Loan Agreement, or get advised as to its terms. (*Def.Supp.St.*, Ex. E, Dep. of Thompson, at 42). As they were unfamiliar with its terms, defendants' contentions that they consciously acceded to the Bulk Loan Agreements' additional warranties in reliance upon HFS's in-house review ring hollow. Instead, the record demonstrates that the defendants decided to sell their loans under the Bulk Loan Agreement because they could get a better price, unconcerned about whatever differences there might be between that agreement and the

Flow Loan Agreement. This is yet another element of equitable estoppel that defendants have failed to establish for the purposes of summary judgment.

The doctrine of estoppel is invoked to prevent fraud and injustice: the test is whether under all the circumstances of the particular case, conscience and honest dealing require that the defendant be estopped. *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill.2d 133, 148, 500 N.E.2d 1, 7 (1986). In this instance, defendants hoped to sell HFS a collection of sixty-three sub-prime loans they had originated. HFS looked the offering over, and selected thirty-six of those loans and rejected the rest. Defendants were able to get a better price for those selected by completing the transaction under the Bulk Loan Agreement, which also might have involved making some additional warranties to HFS. Four of the loans turned out to be fraudulent. Under the terms of the Bulk Loan Agreement, defendants remain responsible for those loans, as they would have had they not sold them. This is simply not the type of scenario that pangs the conscience or appears unfair. In short, had the defendants actually pled their equitable estoppel defense, they would not be able to establish it by clear and unequivocal evidence, and would not even be able to raise a genuine issue regarding it such that summary judgment in defendants' favor would be inappropriate. Accordingly, HFS is entitled to summary judgment on this issue.

## 2. Misconduct

Defendants next argue that HFS engaged in misconduct in its review of the loans offered for sale, and that this relieves defendants from their repurchase obligation under

20

Section 10.1(c) of the Bulk Loan Agreement. As already noted, that provision states that the "Seller shall not have any liability in respect of the representations or warranties on the part of Seller herein contained to the extent such liability would not have arisen but for [HFS's] own willful misconduct or negligence." (*Def.Supp.St.*, Ex. J, at 31). Defendants, however, do not take the trouble to establish that any willful misconduct occurred. (*Def.Mem.*, at 14-15; *Defendants' Reply Memorandum*, ("*Def.Reply*") at 7). They merely submit that "it is undisputed that Household's employees acted improperly in conducting their due diligence review." (*Def.Reply*, at 7). Far from undisputed, there is nothing in the record to suggest that HFS employees engaged in any misconduct during the in-house review.

Willful misconduct involves an intentional disregard of a known duty, and a conscious indifference to the consequences of the action or inaction. *Landwer v. Scitex America Corp.*, 238 Ill.App.3d 403, 409, 606 N.E.2d 485, 489 (1st Dist. 1992). Thus, defendants must first establish that HFS owed them a duty of care. *Id.*; *OnTap Premium Quality Waters, Inc. v. Bank of Northern Illinois, N.A.*, 262 Ill.App.3d 254, 260-61, 634 N.E.2d 425, 430 (2nd Dist. 1994). To determine whether a duty exists, the court considers whether a relationship existed between the parties that imposed a legal obligation upon one party for the benefit of the other party. *Sameer v. Butt*, 343 Ill.App.3d 78, 85, 796 N.E.2d 1063, 1068 (1st Dist. 2003). Here, defendants offer no argument, discussion, or explanation of how any duty on HFS's part might be established. As a result, the court can only

speculate as to its source. The relationship between the parties cannot be said to give rise to the duty defendants contend HFS owed them; this was an arms-length business transaction between two mortgage companies. There is nothing in the Bulk Loan Agreement that suggests HFS owed defendants a duty to put the loan files to the test of its in-house ineligible list. *See Putman v. Village of Bensenville*, 337 Ill.App.3d 197, 208, 786 N.E.2d 203, 211 (2nd Dist. 2003) (question of whether a duty exists in such a case is determined by the terms of the contract). As a result, we must find defendants have neither demonstrated that HFS owed them any duty to conduct a review of the loans offered for purchase, or that there is a genuine issue of fact regarding this question such that summary judgment in HFS's favor would be inappropriate.

Even if defendants could establish that HFS owed them a duty, they would still have to demonstrate a deliberate intention to cause harm, or an utter indifference to, or conscious disregard for, whether such harm occurs. *Landwer*, 238 Ill.App.3d at 409, 606 N.E.2d at 489; *OnTap Premium Quality Waters*, 262 Ill.App.3d at 260-61, 634 N.E.2d at 430. Again, because defendants do not elaborate on their willful misconduct theory, the court can only guess what defendants might characterize as "deliberate intention" or "utter indifference" on the part of HFS. True, in checking sixty-three loan files against approximately one thousand names in the sixteen-page ineligible list, HFS employees failed to notice that the four loans at issue involved entities from that list. There is nothing to suggest that they did so intentionally, deliberately, or indifferently, however.

22

Failing to conjure any evidence of negligence on the part of HFS in their previous motion for summary judgment (*Memorandum Order of February 6, 2004*, at 11-15), defendants have apparently simply opted to assert the other portion of Section 10.1(c), willful misconduct. This is more difficult to establish than negligence, which is perhaps why defendants make no serious attempt to do so. Once again, defendants seemingly hope to succeed on a summary judgment motion, or fend a motion off, without any evidentiary support or, indeed, much in the way of explanation of their position. As a result of this questionable strategy, they fail on both accounts, and the court must conclude that HFS is entitled to summary judgment on this issue.

### 3. Applicability of the Personal Guaranties

Finally, the individual defendants argue that the personal guaranties they executed are ambiguous and cannot be interpreted to apply to the Bulk Loan Agreement. This is simply a reiteration of the argument that failed in the previous summary judgment proceeding. (*Memorandum Order of February 6, 2004*, at 15-18). The individual defendants offer no new evidence or argument that would give the court reason to depart from that ruling.

According to the individual defendants, "the evidence before the Court and the circumstances surrounding the execution of the guaranties" demonstrates that the guaranties pertain only to the Flow Loan Agreement. (*Def.Mem.*, at 5). Central to the individual defendants' interpretation is their contention that the language in the guaranties that

indicates they were executed "as an inducement to [HFS] to enter a Bulk Continuing Loan Purchase Agreement and/or a Flow Loan Purchasing Agreement" is ambiguous because it can be read in the conjunctive or disjunctive. (*Def.Mem.*, at 6). Resolving the ambiguity against the drafter, defendants argue that the documents can only be interpreted to apply to the Flow Loan Agreement because the Bulk Loan Agreement had not yet been contemplated by the parties. (*Def.Mem.*, at 7-9). Based on the clear language of the guaranties and a review of the undisputed facts regarding their timing and execution, however, it is unambiguous that the guaranties apply to the Bulk Continuing Loan Agreement.

As the individual defendants submit, a guaranty is to be strictly construed in favor of the guarantor such that the guarantor is accorded the benefit of any doubt that arises from the contract language. *T.C.T. Bldg. Partnership v. Tandy Corp.*, 323 Ill.App.3d 114, 118-19, 751 N.E.2d 135, 139-40 (1st Dist. 2001). The guarantor is entitled to such benefit, however, only where some doubt arises as to the meaning of the guaranty language. 323 Ill.App.3d at 119, 751 N.E.2d at 140. Where the terms of a guaranty contract are clear and unambiguous, however, they must be given effect as written, and under such circumstances, the meaning of a guaranty is a question of law. 323 Ill.App.3d at 119, 751 N.E.2d at 139. Here, the individual defendants argue that the use of the term "and/or" in the guaranties leaves them susceptible to more than one interpretation; they could refer to the Flow Loan

24

Agreement, the Bulk Loan Agreement, or both. Thus, the individual defendants argue, they are ambiguous and must be construed in their favor.

The individual defendants are correct that a contract will be considered ambiguous if its language is susceptible to more than one reasonable interpretation. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447, 581 N.E.2d 664, 667 (1991). A contract is not ambiguous, however, merely because the parties disagree as to its meaning. *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill.App.3d 285, 290, 695 N.E.2d 503, 506-07 (1st Dist. 1998). Here, the use of the term "and/or" does not render the guaranties ambiguous. Instead, the use of the term *unambiguously* means that the guaranties apply to either the Flow Loan Agreement, the Bulk Loan Agreement, or both. *Detroit Water Team Joint Venture v. Agricultural Ins. Co.*, 371 F.3d 336, 342 (6th Cir. 2004); *Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth*, 666 F.2d 618, 627 (1st Cir.1981) ("the words 'and/or' commonly mean 'the one or the other or both'"); 11 WILLISTON ON CONTRACTS § 30:12 (4th ed.) ("where the term 'and/or' is used in a contract, the intention is that the one word or the other may be taken accordingly as the one or the other will best effect the purpose of the parties as gathered from the contract taken as a whole"). The balance of the language of the guaranties and the undisputed facts of this case make it clear that the guaranties are applicable to the Bulk Loan Agreement.

On May 2, 2000, the parties executed the Flow Loan Agreement, but they never conducted business under its terms. It is undisputed that this was due to the net worth of

TMG. Nearly four months later, on August 28, 2000, the individual defendants executed their personal guaranties, with the express purpose of *inducing* the HFS "to enter into a Bulk Continuing Loan Purchase Agreement and/or a Flow Loan Purchase Agreement." HFS had already entered into the Flow Loan Agreement four months earlier, so "inducement" regarding that document was irrelevant. The guaranties certainly could have provided an inducement for HFS to enter the Bulk Loan Agreement, however, which was yet to come, on November 6, 2000. Thus, between the two agreements listed in the guaranties, the term "inducement" could only logically apply to the Bulk Loan Agreement.

In arguing against this obvious interpretation, defendants ignore the clear meaning of the language at issue, and misstate the undisputed facts of this case. Oddly, individual defendants argue that, because the "only agreement in effect . . . was the Flow Loan Agreement, how can the guaranties apply to the Bulk Agreement?" (*Def.Mem.*, at 8). It is *because* the Flow Loan Agreement was in effect that the guaranties could not be an *inducement* to HFS to enter into it. Individual defendants also repeatedly submit that the parties agree that the guaranties were executed in connection with the sale of loans under the Flow Loan Agreement, citing the Joint Statement of Facts at paragraph nine and their own Supplement Statement of Facts at paragraph twenty-two. (*Def.Mem.*, at 7; *Defendants' Reply Memorandum*, at 3). Paragraph nine of the Joint Statement of Facts, however, does not indicate that the guaranties were executed in connection with the Flow Loan Agreement, but that they were executed about four months later because, despite the parties

26

having entered into the Flow Loan Agreement, HFS was disinclined to purchase loans from TMG. (*Joint St.*, ¶ 9). No loans were sold until the parties executed the Bulk Loan Agreement approximately two months later.

Paragraph twenty-two of defendants' Supplemental Statement of Facts is merely a claim by the individual defendants that they executed the guaranties solely in connection with the Flow Loan Agreement. (*Def.Supp.St.*, ¶ 22). The intent of the parties, however, must be determined from the terms of the contract. *Owens v. McDermott, Will & Emery*, 316 Ill.App.3d 340, 348, 736 N.E.2d 145, 153 (1st Dist. 2000). Whatever intent the individual defendants might have envisioned at the time the guaranties were executed – or envision now – is immaterial given the language of the documents. *Id.* at 349, 736 N.E.2d at 153. The guaranties simply cannot be logically interpreted as an inducement to HFS to enter into an agreement that was four months old.

In any event, the testimony upon which defendants rely to support their assertion that the guaranties applied only to the Flow Loan Agreement is unconvincing. The individual defendants' citations to the depositions of Mark Smith and Jack Schumacher do not indicate that they felt the guaranties were connected to the Flow Loan Agreement. (*Def.Supp.St.*, ¶ 22; Ex. G, Dep. of Smith, at 20: Ex. Ex. L, Dep. of Schumacher, at 20-22). Schumacher even acknowledged that the Flow Loan Agreement had already been executed before the guaranties (*Def.Supp.St.*, Ex. L, Dep. of Schumacher, at 22), which, again, would make it illogical that they could be interpreted as an inducement to HFS to enter into that

agreement. The cited testimony of Thompson simply indicates that he failed to understand the clear language of the guaranty that indicated it was intended as an inducement. Despite the fact that months had passed since the parties executed the Flow Loan Agreement, Thompson testified that:

> the only agreement at this point was the Flow Loan Purchase Agreement. We signed the personal guaranties in connection with that and then proceeded to wait and see what happened after we signed the personal guaranties.

(*Def.Supp.St.*, Ex. E, Dep. of Thompson, at 28-29). What happened is that the parties abandoned the Flow loan Agreement and did business under the Bulk Loan Agreement. Mr. Thompson might have been operating under a misapprehension as to the meaning of the language in the guaranties, but that language clearly can only refer to the Bulk Loan Agreement.

In addition, the individual defendants argue that, because a guaranty must be strictly construed, a guarantor's liability cannot be varied or extended beyond the precise terms of the guaranty, citing *Emrick v. First Nat. Bank of Jonesboro*, 324 Ill.App.3d 1109, 1114, 756 N.E.2d 914, 918 (5th Dist. 2001). (*Def.Mem.*, at 8). In *Emrick*, the guarantor executed a guaranty in a limited amount referring to a specific loan. The court held that this guaranty could not be applied to a second loan which was not mentioned in the guaranty and to which the guarantor was not a party. Obviously, the circumstances here are quite different. In this case, the guaranties at issue specifically cover "all sums due or to become due from [TMG]" under the "Agreements," meaning the Flow Loan Agreement, the Bulk Loan

Agreement or both. The Bulk Loan was not an unmentioned contract that was later executed without the individual defendants' knowledge. While the individual defendants were not, technically, parties to the Bulk Loan Agreement, they were TMG's officers and cannot be said to be unaware such a document was executed.

The language of the guaranties also unequivocally states that they include sums due as a result of "repurchase and indemnification provisions," the very provisions at issue here. This is broad language, certainly broad enough to render the guaranties applicable to the Bulk Loan Agreement, which was executed ten weeks after the guaranties. *See, e.g. Bank of Naperville v. Holz*, 86 Ill.App.3d 533, 537-38, 407 N.E.2d 1102, 1106 (2nd Dist. 1980) (what is shown by the contract to have been the intention of both parties is controlling where guaranty contains broad statements of guarantor liability). As the court previously concluded in its Memorandum Order of February 6, 2004, we cannot find that the individual defendants are entitled to summary judgment on this issue and, instead, must find that HFS is entitled to summary judgment on the question of whether the guaranties apply to the Bulk Loan Agreement.

# III. <u>CONCLUSION</u>

For the foregoing reasons, the plaintiff's motion for summary judgment is denied in

part and granted in part. The defendants' motion for summary judgment is denied.

ENTERED: *Nan R Nolan*

**NAN R. NOLAN**
**U.S. MAGISTRATE JUDGE**

**DATE:** OCT. 2 8 2004